UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION
CAUSE NO. 1:12-cv-561

ANN GARDNER, et al.,          )
                              )
          Plaintiffs,         )
                              )
     -vs-                     )
                              )
WELLPOINT, INC.,              )
                              )
          Defendant.          )

The deposition upon oral examination of KAREN S. AMSTUTZ, a witness produced and sworn before me, Dana S. Miller, a Notary Public in and for the County of Hendricks, State of Indiana, taken on behalf of the Plaintiffs at the offices of Gonzalez, Saggio & Harlan, 135 North Pennsylvania Street, Suite 1740, Indianapolis, Marion County, Indiana, on the 28th day of June, 2013, at 1:07 p.m., pursuant to the Federal Rules of Civil Procedure.

CIRCLE CITY REPORTING
135 North Pennsylvania
Suite 1720
Indianapolis, IN  46204
(317) 635-7857



DEFENDANT'S EXHIBIT K

```
 1                  A P P E A R A N C E S
 2   FOR THE PLAINTIFF(S):   Mark J. Byrne, Esq.
                             JACOBS KLEINMAN SEIBEL & McNALLY
 3                           30 Garfield Place
                             Suite 905
 4                           Cincinnati, OH  45202
 5   FOR THE DEFENDANT(S):   Alejandro Valle, Esq.
                             GONZALEZ SAGGIO & HARLAN LLP
 6                           135 N. Pennsylvania Street
                             Suite 1740
 7                           Indianapolis, IN  46204
 8   ALSO PRESENT:           Ann Gardner
                             Pamela Kapustay
 9
10          I N D E X   O F   E X A M I N A T I O N
11                                                  PAGES
12   DIRECT EXAMINATION ...............................3
         QUESTIONS BY MARK J. BYRNE
13
14
              I N D E X   O F   E X H I B I T S
15
                                                    PAGES
16
     107 - (Previously Marked)  ......................19
17
18
19
20
21
22
23
24
25
```

3

1  K A R E N  S.  A M S T U T Z, having been first duly
2  sworn or affirmed to tell the truth, the whole
3  truth and nothing but the truth relating to said
4  matter, was examined and testified as follows:
5  DIRECT EXAMINATION
6  QUESTIONS BY MARK J. BYRNE:
7  Q. Good afternoon, ma'am. My name is Mark Byrne, and
8     I represent Ms. Kapustay and Ms. Gardner in a claim
9     that's been brought against WellPoint. I'm just
10    going to ask you some questions today relating to
11    your involvement in their termination and the
12    investigation of the involvement.
13        It seems as though I'm starting to lose my
14    voice after two days of doing this, so I'll try to
15    speak up a little bit louder for you, but just a
16    couple of simple rules. One is if you don't
17    understand a question I ask, let me know, I will
18    I'll try to rephrase it to make it more
19    understandable. Okay?
20        Secondly, you need to respond verbally to any
21    question I ask. The court reporter to my right is
22    doing a masterful job after two days of this, but
23    she can't go ahead and take down a response unless
24    it's verbal.
25 A. Okay.

4

1  Q. So a shrug of the shoulders or nod of the head
2     doesn't work, nor does an um-hum, even though I
3     have a bad habit of doing that, also.
4        Thirdly, it's hard for her to take down two
5     people at the same time. So if you let me finish
6     my question, I'll try to extend the same courtesy
7     to you and allow you to finish your answer before I
8     ask another question. All right?
9        And then, finally, if you want to take a break
10    at any time, feel free to ask, I'd be more than
11    happy to accommodate you. Hopefully we won't have
12    you here very long. Okay? Because we've done a
13    lot of depositions, and the issues seem to be
14    crystallizing here somewhat.
15       Can you tell me your present home address?
16 A. It is ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ and that's
17    ▓▓▓▓▓▓▓▓, Indiana ▓▓▓▓▓.
18 Q. And what's your date of birth?
19 A. ▓▓▓▓▓▓, 1962.
20 Q. And are you presently employed?
21 A. Yes.
22 Q. Where is that?
23 A. I'm employed by xG Health Solutions, Incorporated.
24 Q. Is that --
25 A. Little X big G and then Health Solutions. Their

5

1     corporate offices are in Columbia, Maryland.
2  Q. What's the location here in Indianapolis that you
3     work out of?
4  A. I work from my home.
5  Q. And what is your position at xG?
6  A. I'm Vice President and Senior Medical Director.
7  Q. What does xG Health Solutions do?
8  A. We provide a series of product services -- products
9     and services which are solutions for accountable
10    care organizations.
11 Q. And what's an accountable care organization?
12 A. Accountable care organization as defined in the
13    Patient -- the PPACA --
14 Q. PPACA?
15 A. -- and other like organizations.
16 Q. I would ask you --
17 A. So that's the Patient Portability and Accountable
18    Care Act.
19 Q. Sure, March of 2010?
20 A. Correct.
21 Q. I would ask you what page, but it would take three
22    months.
23 A. It would probably take me six months to answer.
24 Q. It took me three months to read it, and I was only
25    looking at the false claim provisions. But

6

1     anyways, when did you leave WellPoint?
2  A. January 10th, 19 -- or excuse me, 2011.
3  Q. And why did you leave?
4  A. I was recruited by xG to join their team.
5  Q. So it was a voluntary termination?
6  A. Yes.
7  Q. You left on your own volition, so to speak?
8  A. Correct.
9  Q. How has the move worked out for you?
10 A. Very well.
11 Q. It's not really fair to ask you that question.
12    With regard to your educational background, can you
13    tell me where you went to college?
14 A. Indiana University in Bloomington, Indiana.
15 Q. And what was your major?
16 A. Bachelor of Arts in chemistry.
17 Q. And what year did you graduate?
18 A. 1984.
19 Q. Upon graduation in '84, what did you do?
20 A. I entered medical school at Washington University
21    in St. Louis. And I graduated from Wash U in 1988.
22 Q. With an M.D.?
23 A. Yes.
24 Q. And then upon graduation in 1988, what did you do?
25 A. Started an internship.

7

1  Q. In what area?
2  A. Internal medicine at Barnes Hospital.
3  Q. And I don't know where Barnes is. Where is Barnes?
4     Is that in St. Louis?
5  A. St. Louis.
6  Q. How long did you intern there?
7  A. Twelve months.
8  Q. Then what did you do?
9  A. Then I moved to Boston, and I had a series of
10    positions in emergency rooms and urgent care.
11 Q. So you worked in certain hospitals in the ER?
12 A. Uh-huh.
13 Q. Is that a yes?
14 A. Yes.
15 Q. And then you worked in certain urgent cares
16    throughout the Boston area?
17 A. Yes.
18 Q. All right. How long did you -- when you say you
19    worked at certain hospitals, were you working for a
20    group?
21 A. No.
22 Q. Okay.
23 A. I was an independent contractor.
24 Q. So you would actually contract with the hospital on
25    an independent basis on your own?

8

1  A. No. I contracted with another physician who was in
2     charge of staffing the emergency room.
3  Q. So there was another physician who had a contract
4     with the hospital to provide ER services. You
5     contracted with him to fulfill the hospital's need
6     for ER services?
7  A. Yes.
8  Q. How long did you do that?
9  A. Two years.
10 Q. And then what did you do?
11 A. Pediatric residency.
12 Q. Where at?
13 A. Massachusetts General Hospital.
14 Q. Was that a two-year residency?
15 A. Two years of residency and six months of chief
16    residency.
17 Q. Didn't get much sleep during those 2 1/2 years, did
18    you?
19 A. No.
20 Q. So then what did -- where does that take us in
21    terms of the timeline?
22 A. 12/31/93.
23 Q. What did you do then?
24 A. I took a position at Indiana University School of
25    Medicine here in Indianapolis.

9

1  Q. What was the position?
2  A. I was a Clinical Assistant Professor of pediatrics.
3     I also was a chief resident for six months from 1/1
4     of '94 through 6/30 of '94.
5  Q. And then what?
6  A. Then I continued in that position.
7  Q. Continued as a chief resident or ...
8  A. Oh, continued as the Clinical Assistant Professor
9     of pediatrics.
10 Q. I was going to say, you're glutton for punishment
11    if you continued as a chief resident.
12 A. Yeah, or any kind of resident.
13 Q. There's no doubt about that. How long did you
14    remain a clinical assistant?
15 A. Through 12/31 of 2004.
16 Q. And then how did your employment situation change?
17 A. I started working for WellPoint, I think it was
18    January 10th of 2005.
19 Q. Well, I'm sure that you've given previous
20    depositions, then.
21 A. I have not.
22 Q. You have not? You're a newbie, so to speak?
23 A. Yes.
24 Q. So what was your position when you started at
25    WellPoint?

10

1  A. Managing Medical Director.
2  Q. Did you work here out of Indianapolis?
3  A. Yes, out of --
4  Q. And then I've had a chance to look at some
5     documents that have been produced, and you were
6     promoted on several occasions?
7  A. Yes.
8  Q. What was your first promotion?
9  A. So I was Managing Medical Director -- several
10    different positions, so let me -- so Managing
11    Medical Director for -- working for Randy Howard in
12    Indiana Healthcare Management. So it was a
13    position -- the next position was working for Dawn
14    Wood as a Managing Medical Director in Medicaid.
15 Q. Is that D-O-N or D-A-W-N?
16 A. D-A-W-N.
17 Q. All right.
18 A. The next position after that was being promoted to
19    VP.
20 Q. VP of what area?
21 A. Medicaid Clinical Operations. I -- actual verbiage
22    of that title, it may not be Medicaid Clinical
23    Operations, it might have been Vice President of
24    Medicaid, might have been Vice President of
25    Healthcare Management. I don't recall exactly how

Page 11

```
 1    that tabled -- or it might have been Vice President
 2    and Medical Director.
 3  Q. Whatever it is, you were working in the Medicaid
 4    department?
 5  A. Yes.
 6  Q. And how long did you maintain this position?
 7  A. The Medicaid, through -- I had Medicaid and that
 8    work through the time that I left the company. I
 9    assumed responsibility for Medicare in, I believe
10    it was 2010, mid-year 2010.
11  Q. You assumed responsibility for the Medicare
12    portion?
13  A. Medicare Clinical Operations.
14  Q. Did you also have responsibility for the Medicaid?
15  A. Yes, it was on top of.
16  Q. And that --
17  A. And then --
18  Q. Go ahead.
19  A. Then sometime in 2011, assumed responsibility for
20    Enterprise Quality.
21  Q. And can you describe for me in 40 words or shorter
22    what Enterprise Quality is?
23  A. It's the -- it's health plan quality across all
24    lines of business, so commercial, Medicare and
25    Medicaid.
```

Page 12

```
 1  Q. Have you ever sued anybody before?
 2  A. No.
 3  Q. Ever been sued before?
 4  A. No.
 5  Q. And I think you said you'd never given a
 6    deposition. Have you ever given testimony under --
 7    in any circumstance?
 8  A. Yes.
 9  Q. When was that?
10  A. 19 -- roughly 1990.
11  Q. And what was the nature of the case that you were
12    called upon?
13  A. I was giving testimony on behalf of being an
14    emergency room physician who saw an individual who
15    had committed a crime; and I needed to describe the
16    injuries.
17  Q. All right. So in 2010, you were in charge of both
18    Medicaid and Medicare?
19  A. Clinical Operations.
20  Q. Clinical Operations, excuse me. And who reported
21    to you at that time?
22  A. So that's a challenging question to answer, because
23    there were lots of changes in the structure of the
24    organization based on vacancies, you know, at say a
25    staff vice president level who then left or, you
```

Page 13

```
 1    know, vacancies then were filled, so ...
 2  Q. Let's just try to narrow it. In August of 2010,
 3    can you tell me who was reporting to you, to the
 4    best of your recollection, and what their position
 5    was?
 6  A. To the best of my recollection, I had a staff VP
 7    Medical Director of Medicaid.
 8  Q. All right.
 9  A. And I believe that was David Buchsbaum.
10  Q. Okay.
11  A. A staff VP Medical -- or a staff VP Clinical
12    Operations for Medicaid; and that was Jean Piercy.
13  Q. All right.
14  A. A staff VP Medical Director for Medicare; and that
15    was Jim Luciano, that's L-U-C-I-A-N-O.
16  Q. Okay. Did you have a clinical op for Medicare?
17  A. Yes. Linda Vetter.
18      MR. VALLE: What was the last name?
19      THE WITNESS: Vetter, V-E-T-T-E-R.
20  A. And I had a staff VP for pharmacy; and that was
21    Alex Ruggieri, R-U-G-G-I-E-R-I. And then, finally,
22    I had a business -- what was the title? What did
23    we call them, like a business project manager.
24    That wasn't the right title, but Naomi Inaba.
25  Q. How do you spell her last name; do you know?
```

Page 14

```
 1  A. I-N-A-B-A.
 2  Q. And then do you recall who was reporting to Jean
 3    Piercy?
 4  A. Pam reported to Jean Piercy. I don't recall the
 5    names --
 6  Q. Anyone else?
 7  A. -- of other people.
 8  Q. And then Ann Gardner would have reported to Pam
 9    Kapustay?
10  A. Correct.
11  Q. Okay. Tell me how you became involved in any
12    investigation relating to either Ms. Kapustay or
13    Ms. Gardner.
14  A. So I was asked -- I mean, I became involved
15    probably -- I became involved by virtue of
16    supervising Jean Piercy. And we would discuss the
17    decisions that she was making in her organization.
18  Q. Okay. In other words, Jean reported to you?
19  A. Correct.
20  Q. Did Jean indicate to you that there was an issue
21    that had arisen in her organization?
22  A. Can you be more specific?
23  Q. Yeah, first of all, let me figure out how specific
24    I'm going to have to be. Did you have a chance to
25    review any documents or anything before today's
```

```
1    STATE OF INDIANA    )
                         ) SS:
2    COUNTY OF HENDRICKS )
3         I, Dana S. Miller, RPR, CRR, a Notary Public in
4    and for the County of Hendricks, State of Indiana at
5    large, do hereby certify that KAREN S. AMSTUTZ, the
6    deponent herein, was by me first duly sworn to tell
7    the truth, the whole truth, and nothing but the
8    truth in above-captioned cause.
9         That the foregoing deposition was taken on
10   behalf of the Plaintiffs at the offices of Gonzalez,
11   Saggio & Harlan, 135 North Pennsylvania Street,
12   Suite 1740, Indianapolis, Marion County, Indiana, on
13   the 28th day of June, 2013, pursuant to the
14   Applicable Rules.
15        That said deposition was taken down in
16   stenograph notes and afterwards reduced to
17   typewriting under my direction, and that the
18   typewritten transcript is a true record of the
19   testimony given by said deponent; and thereafter
20   presented to said deponent for his/her signature;
21        That the parties were represented by their
22   aforementioned counsel;
23        I do further certify that I am a disinterested
24   person in this cause of action; that I am not a
25   relative or attorney of either party, or otherwise
```

1   interested in the event of this action, and am not
2   in the employ of the attorneys for either party.
3       IN WITNESS WHEREOF, I have hereunto set my hand
4   and affixed my notarial seal this 9th day of
5   July, 2013.

       _____
                Dana S. Miller

My Commission Expires:
January 17, 2016

County of Residence:
Hendricks

TO:  CIRCLE CITY REPORTING
REGISTERED PROFESSIONAL REPORTERS
135 N. PENNSYLVANIA STREET
SUITE 1720
INDIANAPOLIS, IN 46204

RE: Indiana Rules of Procedure, Trial Rule 30 (E) and/or Federal Rules of Civil Procedure.

After having read my transcript, I wish to make the following changes:

*PAGE 2 LINE# 8
CHANGE product services
TO products and services
REASON FOR CHANGE

*PAGE 1 LINE# 1
CHANGE tabled
TO titled
REASON FOR CHANGE tabled was not what I said

**PAGE 16 LINE# 11-12
CHANGE "Wagner" to "Herrera"
TO "Herrera"
REASON FOR CHANGE Incorrect last name given

*PAGE 16 LINE# 16
CHANGE No, The Response
TO No, Thomas
REASON FOR CHANGE Incorrect last name given

*PAGE 17 LINE# 11
CHANGE Audition
TO "Juanna Herrera and Kim Thomas"
REASON FOR CHANGE Clarify answer

I am, therefore, signing my transcript conditioned on the fact that the above changes shall be noted with the transcript by the notary public.

Karen S. Amstutz
(Signature of Deponent)